BARTOLA (SERAFINA) MUNDO ET AL., demandantes y recurrentes, *v.* PEDRO FÚSTER ET AL., demandados y recurridos.

*Número:* 12889     *Resuelto:* 15 de febrero de 1963

*Ricardo R. Rivera Correa,* abogado de los recurrentes; *B. Sánchez Castaño* y *R. Rivero Cervera,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Dar a la parte demandada la oportunidad de ser oída es principio esencial de nuestro procedimiento con honda raíz constitucional. *Jacob* v. *Roberts,* 223 U.S. 261 (1912). Para que pueda hacer valer esa oportunidad es preciso notificarla personalmente que se le ha demandado. "Una sentencia dictada sin tal notificación y oportunidad carece de todos los atributos de una determinación judicial; es una usurpación y opresión judicial y nunca puede ser sostenida donde la justicia se administra justicieramente". *Galpín*

v. *Page*, 85 U.S. 350 (1873). En ciertas ocasiones cuando es imposible emplazarla personalmente por desconocerse su paradero, la ley autoriza que se le notifique por edictos en un periódico de circulación general.(¹)  *Mullane* v. *Central Hanover Tr. Co.*, 339 U.S. 306 (1950). La necesidad ha obligado a aceptar otras formas de notificación que han recibido la sanción de los tribunales. *International Shoe Co.* v. *Washington*, 326 U.S. 310 (1945); Dambach, *Personal Jurisdiction: Some Current Problems and Modern Trends*, 5 U.C.L.A. L. Rev. 198 (1958); Comentarios: *Personal Jurisdictions over Absent Natural Persons*, 44 Calif. L. Rev. 737 (1956); Ehrenzweig & Mills, *Personal Service Outside the State*, 41 Calif. L. Rev. 383 (1953). En el pleito que dio margen a este caso se emplazó por edictos y se alegó que los demandados eran personas desconocidas en la comunidad donde vivían. Veamos los hechos en detalle.

Al morir el causante de los demandantes el 26 de marzo de 1931, le sobrevivieron la viuda y veinticuatro hijos. Había contraído matrimonio en dos ocasiones. En la primera ocasión procreó diecisiete hijos de los cuales cinco le premurieron. Enviudó y casado en segundas nupcias, procreó doce hijos. Uno de los hijos del primer matrimonio era doctor en medicina y había servido como médico de beneficencia en el municipio de Loíza y fue electo alcalde de ese

---

(¹) Disponía así el Art. 94 del Código de Enjuiciamiento Civil—32 L.P.R.A. sec. 458—vigente a la fecha en que se expidió el emplazamiento en el caso contra los ahora demandantes:

"Art. 94.—Cuando la persona que deba ser citada resida fuera de la Isla, o se hubiese ausentado de ella, o si *después de la debida diligencia* no pudiere ser encontrada en la Isla, o se ocultare para que no pueda hacérsele la citación, cuando se ignorare su domicilio . . . y así resultare comprobado a *satisfacción de la corte o del juez de la misma* por medio de declaración jurada y apareciese también de dicha declaración o de la demanda jurada presentada, que existe motivo de acción contra el demandado que ha de ser citado, o que dicho demandado es parte necesaria o legítima en el pleito, la corte o el juez puede dictar una orden disponiendo que la citación se haga por la publicación de edictos." (Énfasis suplido.)

Un procedimiento similar establecía la Regla 4(e) de Enjuiciamiento Civil de 1943 y lo mismo establece la Regla 4.5 de las de 1958.

pueblo en las elecciones de 1932. A la fecha de la muerte el causante adeudaba $628.75 a Hernáiz Targa & Cía., de San Juan. Para cobrar la acreencia, la mencionada firma instó acción en cobro de dinero contra "La desconocida Sucesión del fallecido Facundo Mundo". Simultáneamente obtuvo una orden de aseguramiento de sentencia y embargó bienes inmuebles que en el Registro figuraban inscritos a nombre de dicho causante. Alegó la demandante que "ignora si el señor Mundo otorgó o no testamento y quiénes sean sus herederos o causahabientes legales, ni dónde tienen fijadas sus residencias; pero alega la demandante que sus herederos y causahabientes no le han pagado ni en todo ni en parte los $628.75 adeudables por el finado Facundo Mundo". La demanda fue radicada el 18 de enero de 1933 y el 23 de febrero es que se devuelve el emplazamiento con diligenciamiento negativo.

Se autorizó el emplazamiento por edictos. Se publicaron en "La Democracia" durante los días 27 de febrero y 6, 13, 20 y 27 de marzo y 8 de abril de 1933. No hubo comparecencia de la parte demandada. Anotada la rebeldía y celebrada la vista requerida se dictó sentencia a favor de la firma demandada. La sentencia fue notificada mediante edictos. Fue ejecutada sobre los bienes embargados que pertenecían al causante de los demandados. Los bienes —cuatro fincas rústicas—fueron a subasta y se le adjudicaron a la firma acreedora. Otorgada la escritura de venta judicial se inscribió en el Registro de la Propiedad con fecha 2 de septiembre de 1933.

Dos de las fincas, uno de 75 cuerdas y otra de 14 cuerdas fueron vendidas el 15 de julio de 1937 a Pedro Fúster por el precio de $1,501.43.(²) La viuda de Facundo Mundo y sus doce hijos tenían fijada su residencia en la finca de 14 cuerdas. Instaron un pleito independiente contra la liquidadora de Hernáiz Targa & Cía. para recobrar el hogar

---

(²) Otra de las fincas fue adquirida por uno de los miembros de la Sucesión de Facundo Mundo.

seguro. Para satisfacer la sentencia recaída. Fúster agrupó las dos fincas de 75 y 14 cuerdas y segregó 20 cuerdas que traspasó a la viuda y a sus hijos por escritura Núm. 8 de 17 de noviembre de 1939. Fúster vendió las 69 restantes a Aurelio Rodríguez por el precio de $2,000 el 16 de enero de 1947.

En octubre del año 1949 se inició el presente pleito interesando la nulidad de la sentencia recaída en el caso de cobro de dinero a que antes hemos hecho referencia, así como la reivindicación de dos de las fincas adjudicadas a Hernáiz Targa & Cía. y que fueron vendidas a Pedro Fúster y que éste luego de agruparlas y segregar una de veinte cuerdas vendiera el remanente a Aurelio Rodríguez. Se reclaman además los frutos percibidos y que se alegan ascienden a $24,000.[3] La demanda fue dirigida contra Pedro Fúster, los herederos de su esposa fallecida, contra Aurelio Rodríguez y contra la liquidadora de Hernáiz Targa & Cía. Los demandantes desistieron de su acción contra esta última. Los demandados radicaron entonces demanda de tercero contra los socios de Hernáiz Targa & Cía. Sólo uno de los socios fue emplazado y levantó la cuestión de que cualquier acción que pudiera existir contra él estaba prescrita. El tribunal de instancia así lo determinó. Los demandados recurrieron ante nos para revisar esa determinación, pero su recurso fue desestimado. *Mundo* v. *La Mercantil Pedro Rodríguez Ante & Cía.*, Civil Núm. 10849, resolución de 15 de enero de 1953.

La demanda fue declarada sin lugar. El juez sentenciador determinó que: "aunque el antiguo Tribunal de Distrito de San Juan hubiese actuado sin jurisdicción en el caso civil Núm. 18083, habiendo Pedro Fúster primero y Aurelio Rodríguez después adquirido de quien en el Registro aparecía como dueño, sin que del propio Registro se desprendiera claramente vicio alguno que revelara la nulidad del título que

---

[3] Posteriormente se desistió de esta reclamación.

adquiría, y habiendo comprado Pedro Fúster, previo estudio que del referido título le hizo su abogado de entonces, y sin tener conocimiento ninguno de los compradores de vicio extrínseco fuera del Registro que invalidara el título que adquiría, ambos son terceros que están protegidos por el Art. 34 de la Ley Hipotecaria''.

Para una coordinada consideración del asunto planteado pasaremos a discutir en primer lugar la validez de la venta judicial mediante la cual Hernáiz Targa & Cía. adquirió la finca que luego vendió a Fúster. Si esta venta fue válida huelga considerar la hecha a Fúster, pero si por el contrario se determina que no lo es, precisa entonces enfrentarnos a si Fúster es un tercero protegido por la ley.

En el presente caso el emplazamiento de la demandada, "La desconocida Sucesión del fallecido Facundo Mundo" se encomendó a una persona particular y al diligenciarlo negativamente expresó: "que recibí este emplazamiento el 18 de enero de 1933 y con objeto de notificar el mismo a los miembros que compusieran la sucesión del fallecido Facundo Mundo, el día indicado me trasladé al pueblo de Canóvanas, lugar del último domicilio de dicho fallecido y donde ocurrió su muerte, y a pesar de las diligencias de búsqueda que hice en dicho pueblo, *conferenciando no sólo con presuntos familiares de dicho causante*, sino también con personas vecinas y amigas de éste, no pude encontrar a ninguna persona que ostentara legalmente el carácter de heredero de dicho fallecido y de la investigación que practiqué se ignora la residencia de esos herederos legales: que al día siguiente, 19 de enero de 1933 me trasladé al pueblo de Loíza para continuar las investigaciones de qué personas componían la desconocida sucesión de dicho fallecido Facundo Mundo, y no pude notificar el emplazamiento a ninguna persona porque allí nadie sabe quiénes son los miembros que componen esa sucesión ni dónde tienen fijada su residencia: que en la ciudad de San Juan he estado buscando constantemente, desde el día 20 de enero de 1933 hasta hoy 23 de febrero de 1933, quiénes son

las personas que componen la desconocida sucesión de dicho fallecido y tampoco me ha sido posible encontrarlas ni he podido, por tanto, notificarles el emplazamiento aludido: que en vista de que no se sabe quiénes componen legalmente la desconocida sucesión del fallecido Facundo Mundo, ni dónde tienen fijada su residencia, devuelvo este emplazamiento sin diligenciar."

El Art. 94 del antiguo Código de Procedimiento Civil, al igual que las disposiciones correspondientes de las Reglas de Procedimiento Civil de 1943 y 1958, requería que se acompañara una declaración jurada con la petición que se hacía al tribunal para que autorizara la citación por edictos, en la cual debía establecerse que después de la debida diligencia la persona demandada no pudo ser encontrada en Puerto Rico. La declaración jurada que acompañó la firma demandante con su "Moción para que la desconocida Sucesión demandada sea citada por medio de edictos" exponía "[q]ue según la mejor información y creencia de este declarante, Facundo Mundo murió sin haber otorgado testamento y se ignora quiénes son sus herederos o causahabientes, ni dónde tienen fijada su residencia, por lo cual dicha desconocida sucesión no ha podido ser emplazada de la demanda en este caso, según consta al dorso del emplazamiento librado en este asunto por el Secretario de esta Hon. Corte, con fecha 18 de enero de 1933: Que la desconocida sucesión del fallecido Facundo Mundo es parte necesaria en este pleito y se le han embargado bienes por la demandante".

¿Es suficiente lo expuesto en la declaración jurada transcrita para que procediera la citación por edictos y se dispensara del requisito de notificarle personalmente a los demandados? En el caso de *Danis* v. *Corte Municipal*, 57 D.P.R. 830 (1940) expresamos que: "[n]o basta, asimismo, exponer que se desconoce el paradero actual de los demandados pues la ley, como hemos visto, exige que se hagan las diligencias correspondientes para que como resultado de ellas quede satisfecho el juez de la existencia de los hechos justificativos de

la orden de citación por edictos". Véanse además: *Goldsmith* v. *Villari*, 27 D.P.R. 794 (1919); *Vázquez* v. *Corte Municipal*, 52 D.P.R. 257 (1937); *Planas* v. *Chambers*, 59 D.P.R. 494 (1941); *Matos* v. *Agrait, Juez*, 59 D.P.R. 291 (1941); *Cerdá* v. *Ossorio*, 65 D.P.R. 336 (1945).

La declaración jurada en el caso de *Danis* exponía: "[q]ue los demandados, según información, y creencia del declarante, tenían su residencia en Santander, 'España, en años anteriores y mediante investigaciones practicadas por el declarante en la ciudad de San Juan nos consta que dichos demandados no tenían parientes en esta Isla, y se desconoce su paradero actual". Resolvimos que no era suficiente lo expuesto para justificar la citación por edictos ya que: ". . . el deponente debió haber expresado en qué consistían las investigaciones que dijo haber hecho para determinar el paradero de los demandados".

█ El caso de *Danis* no hace otra cosa que seguir la pauta establecida en las jurisdicciones donde existen disposiciones como la nuestra, que autorizan la citación por edictos, cuando median ciertas circunstancias. El Art. 94 del Código de Enjuiciamiento Civil, es esencialmente igual al Art. 412 del Código de Procedimiento Civil de California. En aquel estado se ha sostenido que para que proceda la citación por edictos hay que demostrar que se ha sido diligente al tratar de localizar a los demandados para emplazarlos personalmente y que a pesar de esa diligencia ha sido imposible localizarlos. *Batte* v. *Bandy*, 332 P.2d 439 (Cal. 1958); *Vorburg* v. *Vorburg*, 117 P.2d 875 (Cal. 1941); *Stern* v. *Judson*, 127 P. 38 (Cal. 1912); *Ligare* v. *California Southern R. Co.*, 18 P. 777 (Cal. 1888); *Ricketson* v. *Richardson*, 26 Cal. 149 (1864).

La declaración jurada que a ese efecto se preste debe contener hechos específicos demostrativos de esa diligencia y no meras generalidades que no son otra cosa que prueba de referencia. █ En los casos que hemos estudiado aparecen específicamente las gestiones hechas con expresión de las personas

con quiénes se investigó y la dirección de éstas. *Jacob* v. *Roberts*, supra; *Miller* v. *Superior Court*, 16 Cal. Rptr. 36 (1961); *Wyoming Pacific Oil Co.* v. *Preston*, 329 P.2d 489 (Cal. 1958); *Campbell* v. *Doherty*, 206 P.2d 1145 (N.M. 1949); *Union Guardian Trust Co.* v. *Cherluk*, 267 N.W. 569 (Mich. 1936); *Middleton* v. *Montague*, 137 N.Y.S. 520 (1912); *Rue* v. *Quinn*, 137 Cal. 651 (1907); *Iowa State Savings Bank* v. *Jacobson*, 66 N.W. 453 (S.D. 1896); *Bradford* v. *McAvoy*, 33 P. 1091 (Cal. 1893); Anotaciones: *Service By Publication: Affidavit*, 21 A.L.R.2d 929 (1952) y 47 A.L.R.2d 423 (1956). Hacerlo constar es de incalculable valor para evitar el fraude. Es buena práctica inquirir de las autoridades de la comunidad, la policía, el alcalde, del administrador de correos que son las personas más llamadas a conocer la residencia o el paradero de las personas que viven en la comunidad. *Parker* v. *Ross*, 217 P.2d 373, 21 A.L.R.2d 919 (Utah 1950) opinión concurrente. Demostrar que se han hecho todas estas diligencias es la única forma en que puede establecérsele satisfactoriamente al juez la imposibilidad de notificar personalmente al demandado.

El juez de instancia a quien se le presente una moción para que se autorice la citación por edictos debe cerciorarse de que "se han hecho las diligencias necesarias para determinar el paradero del demandado". *Danis* v. *Corte Municipal*, supra.

En *Danis* expresamos:

"De los autos resulta que los demandados tenían un apoderado en la ciudad de San Juan, circunstancia ésta que no ignoraban las demandantes ya que trataron de emplazar a los demandados a través de dicho apoderado, a pesar de que su abogado manifestó que él sabía que tal citación no tenía efecto legal alguno. ¿Por qué no trató de investigar con ese apoderado el paradero de los demandados? Probablemente nadie hubiera estado en mejores condiciones que aquél para conocer el paradero de sus mandantes. Si los demandados no tenían parientes en Puerto Rico como se asegura en la declaración

jurada, ¿por qué no trató de investigarse con sus amigos o relacionados? Hechos de esta índole son los que deben aparecer en el affidavit para que el juez pueda por sí mismo llegar a la conclusión de que en realidad se han hecho las diligencias necesarias para determinar el paradero del demandado, pues no es a satisfacción de la parte demandante si que a la del juez que ha de expedir la orden, que deben probarse los hechos jurisdiccionales para dictarla."

■ La declaración jurada que se acompañó a la moción interesando la autorización para citar por edictos y lo expuesto por la persona particular que diligenció negativamente el emplazamiento no expresan quiénes fueron las personas a quiénes se preguntó sobre la residencia de los componentes de la Sucesión Facundo Mundo. La demandante embargó las fincas pertenecientes al causante pero no aparece que la persona encargada del emplazamiento fuera a las fincas para ver si en ellas residían los demandados, o si la persona encargada de las mismas podía dar información sobre su paradero. Ya hemos dejado consignado que la viuda con doce hijos del segundo matrimonio de Facundo Mundo residía en una de ellas. No aparece que solicitara información de la policía, ni del alcalde del pueblo donde residía el causante. Hace constar en el diligenciamiento negativo que se trasladó "al Pueblo de Loíza para continuar las investigaciones de qué personas componían la desconocida Sucesión de dicho fallecido Facundo Mundo y no pude notificar a ninguna persona porque allí nadie sabía quiénes son los miembros que componen esa sucesión ni dónde tienen fijada su residencia". Si hubiera solicitado esa información del alcalde de Loíza se hubiera encontrado con que éste era uno de los miembros de la sucesión demandada y albacea testamentario de Facundo Mundo. La declaración jurada en este caso es igual a la que consideramos insuficiente en el caso de *Danis*. Es típica de aquellas que lo que contienen son generalidades.

■ Siendo la declaración jurada insuficiente para justificar la citación por edictos, el tribunal nunca adquirió

jurisdicción sobre los demandados y la sentencia dictada a favor de Hernáiz Targa & Cía. es nula e ineficaz. *Cerdá* v. *Ossorio*, supra; *Danis* v. *Corte Municipal*, supra; *Matos* v. *Agrait, Juez*, supra; *Goldsmith* v. *Villari*, supra. Así lo es también la venta judicial mediante la cual se le adjudicaron las fincas que luego vendió a Pedro Fúster.

Ahora ¿qué hizo constar el Registrador al inscribir las fincas a nombre de Hernáiz Targa & Cía.? Veamos el asiento de inscripción de la venta judicial sobre una de las fincas:

"Ante la Corte de este distrito judicial siguió la mercantil Hernáiz Targa y Compañía, Sucesores S. en C. el caso Civil número diez y ocho mil ochenta [sic] *contra la sucesión desconocida de Facundo Mundo* en cobro de seiscientos veinte y ocho dollars setenta y cinco centavos con interés del seis por ciento anual desde diez y ocho de enero de mil novecientos treinta y tres hasta su total solvento y costas causadas y que se causen, manifestando que el demandado había fallecido en marzo de mil novecientos treinta y dos sin haber pagado total ni parcialmente la suma indicada; *que la demandante ignoraba si el deudor había otorgado o no testamento ni quienes eran sus sucesores o causahabientes y no habiendo podido ser personalmente citados la sucesión del demandado, fue citada por edictos que se publicaron en el periódico 'La Democracia'* por cuarenta días en las ediciones de veinte y siete de febrero, seis, trece, veinte y veintisiete de marzo y ocho de abril de mil novecientos treinta y tres, anotándose su rebeldía el veinte y cuatro de mayo siguiente y señalada la vista, la Corte dictó sentencia el veinte y seis de dicho último mes, condenando a la sucesión desconocida del demandado a pagar a la demandante la expresada suma, intereses legales y costas; sentencia que fue notificada a la sucesión desconocida del deudor y habiendo quedado firme, obtuvo la demandante orden de ejecución el catorce de julio próximo pasado, dictada por el Juez C. Llauger Díaz, disponiendo la venta en pública subasta de los bienes embargados, que lo fueron esta finca y tres más que registran donde indica la nota marginal, y el Márshal de la propia Corte señaló para el quince de agosto mil novecientos treinta y tres a las dos de la tarde el remate, presentándose como único postor, la mercantil actora por su abogado Ángel A. Vázquez que ofreció

ciento cincuenta dollars por cada finca o sea un total de seiscientos dollars para abonar a la cuenta reclamada." (Énfasis suplido.)

La información que aparece de la inscripción transcrita, sin más, no puede razonablemente decirse que da aviso a un adquirente de que se omitió cumplir con lo preceptuado por la ley para que la corte que conoció del caso en cobro de dinero adquiriera jurisdicción sobre los demandados. Escuetamente informa que se siguió un pleito contra una sucesión desconocida y "no habiendo podido ser personalmente citados la sucesión del demandado, fue citada por edictos que se publicaron en el periódico 'La Democracia' " y la ley autoriza la citación por edictos cuando no se puede emplazar personalmente a los demandados. Del Registro no surge el defecto.

■ En *Lizardi* v. *Caballero*, 65 D.P.R. 83 (1945) expresamos que sólo hay que atenerse a la inscripción en el Registro para determinar si el motivo de nulidad aparece claramente de la inscripción. Ver además, *Pueblo* v. *Riera*, 27 D.P.R. 1 (1919); *Rubio Sacarello* v. *Roig*, 84 D.P.R. 344 (1962). Esta es la doctrina aceptada por los comentaristas. "[E]l adquirente no está obligado a acudir a más fuente de información jurídica que el Registro que es el medio de que el estado real de la finca llegue a su conocimiento . . ." Sanz, Fernández, *Comentarios a la Nueva Ley Hipotecaria*, pág. 259 (Madrid).

Hemos sostenido, sin embargo, que si el adquirente tiene conocimiento personal del defecto que produce la nulidad, no le ampara la protección registral. *Álvarez Barbosa* v. *Aponte Rivera*, 83 D.P.R. 617 (1961); *Quintana Reyes* v. *La Capital de Puerto Rico*, 51 D.P.R. 106 (1937); *Cuebas* v. *Banco Territorial y Agrícola et al.*, 19 D.P.R. 1171 (1913); *Blanco* v. *Hernández et al.*, 18 D.P.R. 711 (1912); *Suris* v. *Quiñones et al.*, 17 D.P.R. 646 (1911); *Abella* v. *Antuñano*, 14 D.P.R. 498 (1908); *Valdés* contra *Valle y Noble*, 1 S.T.S.P.R. 75, 95 (1899).

■ Roca Sastre sostiene que "[l]a circunstancia de que el tercero haya adquirido de *buena fe,* como presupuesto necesario para la protección registral, es cosa embebida dentro del importante principio de la *fides pública registral".* Roca Sastre, *Derecho Hipotecario,* Tomo I, pág. 510 (Barcelona 1954). Así la buena fe es uno de los requisitos que debe reunir el tercer adquirente para poder gozar de las ventajas que reporta el principio de la fe pública. Y a la página 517 continúa *Roca Sastre:*

"¿En qué consiste la *buena fe hipotecaria,* o sea la buena fe necesaria para disfrutar de la protección registral? En líneas generales, podemos avanzar este concepto: *Buena fe,* en el sentido técnico aquí empleado, es el *desconocimiento* por el tercer adquirente de la *verdadera situación jurídica* del derecho adquirido, en la parte no reflejada exacta o íntegramente en el Registro. Es la *ignorancia* de la *inexactitud registral,* entendida ésta en *sentido amplio.*

"Utilizando el léxico de la jurisprudencia, puede decirse que la buena fe es la *falta de conocimiento perfecto* (scientia) por parte del tercer adquirente, de las *condiciones* con que hubo de verificarse la adquisición, *no consignadas en el Registro."*

Citando de otro autor, Lacruz Berdejo, en sus *Lecciones de Derecho Inmobiliario Registral,* (Zaragoza 1957) a la pág. 267 expone que "al titular 'le basta ser un ciudadano corriente que haya creído *honradamente* al negociar sobre inmuebles y derechos reales que el Registro expresaba la verdad'; cabe pensar con todo, que en el pensamiento del autor esta *honradez* incluye una mínima dósis de diligencia, cuando el adquirente tenga la fundada sospecha de ser el Registro innexacto."

Tellez Miguélez en su *Legislación Hipotecaria* (Madrid 1949) a la pág. 130 expresa al discutir la buena fe y el Registro:

"De este concepto legal cabe deducir otro más extenso, que define la buena fe como 'desconocimiento por el tercer adquirente, en el momento de la adquisición, de la inexactitud registral y de los vicios que pueden anular, rescindir, resolver o

revocar la titularidad del transferente', siendo la determinación de la existencia de este requisito—que se presume siempre, mientras no se pruebe lo contrario—un problema de hecho cuya apreciación depende de los Tribunales."

Se ha dicho además, que "podemos, pues definir la buena fe del tercer adquirente como 'aquella creencia fundada en la inscripción a favor del transferente de que éste es el titular real y puede disponer de ese deercho'." Vallet de Goytisolo, *La Buena Fe, la Inscripción, y la Posesión en la Mecánica de la Fe Pública*, 31 Revista de Derecho Privado, 931 (1947). Ver Martínez Escobar, *Las Inscripciones*, Tomo 1, pág. 26 *et seq.* (1ra. ed.).

■ Así, precisa que analicemos los hechos para determinar si a Pedro Fúster le acompaña la buena fe.

Ya hemos visto que la inscripción registral revela que Hernáiz Targa & Cía. había seguido ante la corte de Distrito el caso Civil 18083 en cobro de dinero *contra la Sucesión desconocida de Facundo Mundo*, que ignoraba quiénes eran los sucesores de Facundo Mundo y que la sucesión no pudo ser personalmente notificada por lo que fue citada por edictos. Esto hemos visto era falso. La Sucesión de Facundo Mundo era conocida y si se hubiera realizado el más mínimo esfuerzo *bona fide* se les hubiera podido notificar personalmente del pleito incoado contra ellos por Hernáiz Targa & Cía. ¿Conocía de esta falsedad Pedro Fúster a la fecha en que compró las fincas? Veamos lo que el propio Fúster declaró sobre eso. Su abogado le formula las siguientes preguntas:

"P. La siguiente pregunta es si usted, cuando los procedimientos de ejecución sabe dónde vivía la familia Mundo.

R. Uno yo conocía que vivía en Canóvanas, y en la finca habían como tres o cuatro, y en la finca que yo compré, que tenía como diez personas.

P. ¿En qué sitio era que vivían? ¿En el pueblo, o en qué sitio?

R. Yo conocía al doctor Mundo. Lo conocí en el sentido de que él es un buen doctor.

> P. Está bien. Pero yo le estoy preguntando que dónde ellos vivían.
>
> R. En la finca que yo compré."
>
> (T. de E. Matos Cintrón, pág. 20.)

Más adelante a la pág. 22 el juez que presidió la vista le pregunta:

> "P. Ahora, ¿Con quién fue que usted habló eso?
>
> R. Con Nemesio Mundo, que era el varón que había y yo hablé con él a ver si me cuidaba el ganado.
>
> P. ¿Habló usted con relación a qué se decía?
>
> R. Bueno . . . Ellos me decían que ellos tenían una deuda en San Juan.
>
> P. ¿Le dijeron con quién era la deuda?
>
> R. Bueno . . . Unos decían Hernáiz Targa y otros Rodríguez Anté. El asunto fue que ellos esperaban una sorpresa y estaban como medio confusos y asustados.
>
> P. ¿Por qué ellos estaban confusos y asustados?
>
> R. Bueno . . . Porque ellos esperaban el embargo en cualquier momento y no me podían cuidar el ganado ni nada de eso."
>
> (T. de E. pág. 22–23.)

Admite además el demandado Fúster que conocía al causante y a su viuda y con ésta a sus hijos que vivían en la finca cuando él la compró.

Así la prueba revela que Fúster conocía a Facundo Mundo, a su viuda y a los hijos, en otras palabras, le constaba que era falsa la afirmación que aparecía en el registro al efecto de que se ignoraban quiénes componían la Sucesión de Facundo Mundo. Que la viuda y doce hijos vivían en la finca al momento de radicarse el pleito por lo que Hernáiz Targa & Cía. pudo haberlos emplazado. Le constaba asimismo que la viuda y sus hijos estaban en posesión de la finca en todo momento desde que le fue adjudicada a Hernáiz Targa & Cía. Transcurrieron cuatro años desde que le fueron adjudicadas las fincas hasta la fecha en que la vendieron a Fúster. Así al registro revelar que no habían sido emplazadas personalmente los miembros de la Sucesión de Facundo Mundo tenía necesariamente que inferir que todo

el procedimiento para el cobro de la deuda así como la adjudicación de las fincas en su pago se habían hecho a espaldas de los aquí demandantes. Tenía conocimiento de que aunque los Mundo estaban enterados de que su padre al morir debía un dinero a Hernáiz Targa & Cía. el registro le informaba que nunca fueron notificados de que se había radicado una demanda en contra de ellos ni de que se habían vendido unas fincas en pública subasta para hacer efectiva la sentencia. Su testimonio además demuestra que todo esto le preocupaba ya que manifiesta que llevó un abogado al registro antes de comprar, pues "yo necesitaba saber si estaba bien la cuestión de la subasta y eso, porque yo quería saber lo que me decían". Esto necesariamente implica que él tenía conocimiento de que se comentaba de que algo se había hecho mal en relación con las fincas de los Mundo. El hecho de que un abogado le informara que todo estaba bien, carece de importancia ya que el abogado obviamente lo aconsejó de acuerdo con lo que surgía del registro, pero no hay prueba de que Fúster le hubiera manifestado que él conocía todos los anteriores detalles relacionados con el asunto. Forzoso es concluir que todas estas circunstancias extraregistrales conocidas de Fúster le impedían tener la creencia que Hernáiz Targa & Cía. era el legítimo titular del derecho que a su favor aparecía inscrito.

No vemos cómo pueda válidamente sostenerse que Fúster honradamente creía que el registro expresaba la verdad. A él personalmente le constaba que era inexacto lo que del registro surgía. Para que exista buena fe, como dice Roca Sastre, es necesario el desconocimiento por el tercer adquirente de la verdadera situación jurídica del derecho adquirido. Y como dice Téllez Miguélez "desconocimiento por el tercer adquirente en el momento de la adquisición de la inexactitud y de los vicios que puedan anular, rescindir, resolver o revocar la titularidad del transferente". Es obvia la carencia de buena fe de Pedro Fúster. El Registro no le puede proteger.

█ Consideraremos ahora la venta hecha por Fúster a Aurelio Rodríguez. La prueba establece sin que fuera contradicho el testimonio a ese efecto del abogado de los demandantes, corroborado por un empleado del municipio de Carolina, que Aurelio Rodríguez, cuando fue emplazado en el presente caso, o sea dos años después de aparecer adquiriendo la finca, trabajaba como obrero en el municipio con un jornal de $2.00 diarios y que cuando le notificaron el emplazamiento informó que él no era el dueño de la finca y que la misma pertenecía a Fúster.([4]) *Navarro* v. *Compañía Azucarera "El Ejemplo"*, 53 D.P.R. 726 (1938); pero véase *Biaggi* v. *Sucn. Esbrí*, 71 D.P.R. 450 (1950). Además hay otra prueba corroborativa de esto. Evidentemente la venta hecha por Fúster a Aurelio Rodríguez fue simulada.

*En vista de lo expuesto, procede revocar la sentencia recurrida y en su consecuencia declarar con lugar la demanda de reivindicación.*

---

([4]) De los autos surge que Aurelio Rodríguez otorgó un pagaré al portador por $3,000.00 garantizado con hipoteca sobre esta finca. La legitimidad de esa transacción no ha sido objeto de litigio en este pleito.